# CHARLESTON.

STATE *ex rel* W. P. MULLINS *v.* BOARD OF CANVASSERS OF
McDOWELL COUNTY.

(No. 5830)

Submitted September 8, 1926.   Decided September 14, 1926.

ELECTIONS—*Where on Recount it Conclusively Appears That a
Great Number of Ballots Have Been Changed After the
Canvass by Election Officials in Favor of the Same Candi-
date, All Ballots Should be Rejected and Results Ascer-
tained from Certificates of Election Officials.*

Where on a recount by the board of canvassers it conclu-
sively appears from an examination of the ballots and the
testimony of the election officers that a great number of the
ballots from a particular precinct have been changed by
erasures and remarking after the canvass of the vote by the
election officers, all such changes having been made in favor
of the same candidate, however slight the evidence of oppor-
tunity to tamper with the ballots may be, all the ballots from
such precinct should be rejected on the recount and the re-
sult ascertained from the certificates made by the election
officers.

Original Jurisdiction.

Writ of Mandamus petitioned for by W. P. Mullins and
others directed against the Board of Canvassers of McDowell
County.

*Writ awarded.*

*Sanders, Crockett, Fox & Sanders,* for relators.
*G. L. Counts,* Prosecuting Attorney, for respondents.

MILLER, JUDGE:

At a general primary election, held August 3, 1926, the
relator W. P. Mullins was a candidate on the Republican
ticket for the office of president of the board of education of
Sand River District, McDowell County. He was opposed on
the same ticket by the respondent George W. Jewell. A
canvass of the vote from the seven precincts in the district

showed Mullins to have received 480 votes and Jewell 451, a majority of 29 votes for Mullins. A recount demanded by Jewell gave him 455 votes and Mullins 453, a majority of 2 votes in favor of Jewell. By this proceeding the relator Mullins seeks a peremptory writ of mandamus commanding the board of canvassers to reassemble and reject the ballots cast in precinct number four of said district on the ground that the evidence shows said ballots to have been tampered with and altered, and to issue him a certificate of election.

The recount as to six of the precincts in the district showed a change of but two votes, but as to precinct number four there was a change of 57 votes in favor of Jewell, counting all the ballots cast and returned to the clerk of the county court by the election officials. After ascertaining the result as just stated, the board of canvassers, as a part of the same recount, rejected 26 ballots, which they found to have been tampered with and altered, 21 of which they had at first counted for Jewell, and five of which they had counted for Mullins. The canvass of the returns made by the election officers gave Jewell 64 votes in precinct number four, and Mullins 57 votes, and the recount, after rejecting the 26 ballots found to have been altered, gave Jewell 71 votes, and Mullins 30.

The petition charges that by an inspection of the ballots the board of canvassers ascertained that a number of them had been tampered with and altered; that it was apparent that these ballots had originally been cast for Mullins, but had been altered so as to make it appear they were cast for Jewell; and that in addition to the 26 ballots rejected, a number of altered ballots were counted for the respondent Jewell, with the result that he was declared elected.

The return of the board of canvassers admits that upon the recount twenty-five ballots were rejected, "for the reason that opposite the name of Jewell there was a heavy cross mark on twenty-one ballots, and opposite the name of Mullins there was evidence of a very dim mark, and on five ballots a heavy cross mark was opposite Mullins' name and a dim mark opposite Jewell's name, as will fully appear from an examination

of the original ballots, with the marks thereon as aforesaid.''
The return further recites that when the polls at precinct
number four were closed, the election officers counted the bal-
lots, made up their certificates, and placed the ballots in
envelopes and sealed the same; that thereupon the envelopes
so sealed were delivered to one of the election commissioners,
who took them to his home, where, noticing that the inside
flap used to cover the opening where ballots are inserted in
the ballot box was open, he unlocked the box and closed the
opening; that the said commissioner testified that he did not
in any way molest or change the ballots; that on the day
following the election said commissioner delivered the ballot
box and ballots to the clerk of the county court; that said
envelopes were examined when delivered and found to be
properly sealed, with the signatures of the election officers
across the flaps thereof; that there was no evidence whatever
of said envelopes having been tampered with; and that after
the delivery of the ballots to the county clerk, they were
placed in the vault in his office, and that no one had an oppor-
tunity to tamper with them.

An examination of the 21 ballots now marked as voted for
Jewell, and rejected on the recount, shows beyond doubt that
pencil marks have been erased from the squares opposite
Mullins' name. The five ballots now marked for Mullins,
rejected on the recount, do not bear evidence of erasures
opposite Jewell's name, but only indentures in the paper,
which might have been, and apparently were, made by pres-
sure of a pencil in marking ballots for Jewell lying directly
on top of the five ballots in question.

Six of the election officers of precinct number four testified
before the board of canvassers that ''one or not more than
two'' ballots were found by them to have been changed at the
time they canvassed the vote at the close of the election, and
that they could not account for the erasures and changes
found by the canvassing board on the recount.

There can be no doubt that the 21 ballots above referred to
were changed by erasures and remarking, and that the
changes were made after the count by the election officers.

It is not at all probable that 21 voters out of a total of 127 would make the same mistake in marking their ballots and correct it by means of erasures and remarking. Then we have the testimony of the election officers, that they found not more than two such changes. As the ballots now appear these officers could not have failed to see the evidence of erasures. And in a number of instances the cross mark opposite Jewell's name is entirely different in appearance from all the other marks on the same ballot, in some cases heavier, in others lighter, and other distinguishing features appear, though on some of the ballots it appears that an attempt was made to counterfeit or copy the marks made by the voter, in size and appearance. Another fact is noted, that the precinct returns made by the election officers show a total of 121 votes cast for the two contestants, out of a total of 127 ballots, while on the recount, before the rejection of the 26 ballots in question, each of the 127 ballots was found to have been marked for one or the other of the candidates.

Respondents have made no appearance except to file their return to the alternative writ; and no brief has been filed in their behalf. The return in effect alleges that there was no evidence of tampering except the fact, as they found, that some of the ballots had been changed by erasures and remarking. We have already alluded to the manner in which the ballots were handled and cared for from the time they left the voting place until they were turned over to the custody of the clerk of the county court. The original envelope in which the ballots were sealed by the election officers is before us in evidence. It has been opened by breaking the wax seals placed over the edge of the flap and tearing the flap away from the body of the envelope. The flap and the remnants of the seals are now so badly mutilated, that it is impossible to say whether it was opened more than once before the canvass. From all present appearances it has been roughly dealt with at some time.

The general rule as laid down by our decisions, as well as by those of other jurisdictions, is that the certificates made by the precinct election officers are prima facie evidence of the

result of the election, but that the ballots, if identified as the same cast at the polls, are the best evidence of such result, when it appears that they have been preserved in the manner and by the officers prescribed by the statute, and that while in such custody they have not been changed or tampered with. *Dent* v. *Board of Canvassers*, 45 W. Va. 750; *Stafford* v. *Sheppard*, 57 W. Va. 84; *Williamson* v. *Musick*, 60 W. Va. 59; *McKinzie et al.* v. *Hatfield, Mayor, etc.*, 77 W. Va. 508; *Gabbert* v. *Robinson et al.*, 88 W. Va. 708.

While in this case the evidence of opportunity to tamper. with the ballots while they were in the custody of the proper officers charged with preserving them may not of itself be sufficient to destroy their value as primary evidence, it conclusively appears that they were changed at some time between the canvass by the election commissioners and the recount by the board of canvassers. The board of canvassers in their return admit that they found twenty-six ballots to have been changed, and gave that as their reason for rejecting them on the recount. The respondent Jewell made no return to the writ.

We think this case is controlled by the decision in *State ex rel. Jarrett* v. *Banks et al.*, 98 W. Va. 332, where it was said: "We deem it unnecessary to discuss the conflicting evidence as to the care and custody of the ballots and the opportunity of access thereto. No matter how close the custody or how great the care, their present appearance is proof that the despoiler found the opportunity." And the rule laid down in our decisions above referred to holds that in order to continue the ballots as controlling evidence, not only must it appear that they have been preserved in the manner and by the officers prescribed by the statute, but it must appear that "they have not been changed or tampered with." *Stafford* v. *Sheppard, supra.* Any presumption that may arise from evidence of care, or from lack of evidence of opportunity to tamper, must of course give way to the actual fact when established, that the ballots on their faces show that they have been changed. The election officers testified that no more than two changes by erasures had been made when the ballots were

counted on election day: the board of canvassers found that twenty-six of the same ballots had been so changed that they could not determine for whom they were cast by the voters; and the ballots now show unmistakable evidence of the changes charged by the relator. Where, when and by whom such changes were made does not matter.

The evidence clearly proving that the ballots cast at precinct number four were not preserved in such manner as to maintain their character as primary evidence, they can not be looked to by the board of canvassers in ascertaining the result of the election, and resort must be had to the certificates of the precinct election officers therefor. *State ex rel. Jarrett* v. *Banks et al., supra,* and cases cited.

Our conclusion is that relator is entitled to the relief prayed for, and a peremptory writ of mandamus will be awarded in conformity with the alternative writ heretofore issued.

*Writ awarded.*